# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON


CARLETTA WILSON,                    :    Case No. 3:17-cv-00289
                                    :
              Plaintiff,            :    District Judge Walter H. Rice
                                    :    Magistrate Judge Sharon L. Ovington
vs.                                 :
                                    :
COMMISSIONER OF THE SOCIAL          :
SECURITY ADMINISTRATION,            :
                                    :
              Defendant.            :
                                    :

---

## REPORT AND RECOMMENDATIONS[1]

---

## I.    Introduction

After concluding that she could no longer work as of March 28, 2013, Plaintiff

Carletta Wilson turned to the Social Security Administration (SSA) for assistance by

applying for Disability Insurance Benefits and Supplemental Security Income.  The SSA

denied Plaintiff's applications based mainly on Administrative Law Judge Elizabeth A.

Motta's conclusion that she was not under a "disability" as the Social Security Act defines

it.  (Doc. #6, *PageID* #s 40-52).

Plaintiff argues that ALJ Motta's decision is flawed due to her (1) inadequate

findings about Plaintiff's need to elevate her legs, (2) unreasonable findings about Plaintiff's

daily activities, (3) unjustified reliance upon record-reviewing physicians' opinions, (4)

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

failure to evaluate Plaintiff's disability status before she underwent foot surgery, and (5) failure to adequately consider Plaintiff's cervical impairment. Plaintiff seeks an Order reversing the ALJ's decision and remanding this matter for payment of benefits.

The Commissioner finds no error in ALJ Motta's decision, no merit in Plaintiff's contentions, and substantial evidence supporting the ALJ's decision. The Commissioner therefore asks the Court to affirm the ALJ's decision.

## II.    "Disability" Defined and Standards of Review

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 423(a)(1), 1382(a). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—*i.e.*, "substantial gainful activity." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Present judicial review of ALJ Motta's decision proceeds along two lines: whether she applied the correct legal standards and whether substantial evidence supports her findings. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486

F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance…." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

If the ALJ applied incorrect legal criteria, reversal may be warranted even though the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.

## III.    Plaintiff and Her Testimony

### A.

Plaintiff was 39 years old on the date her asserted disability began (March 28, 2013). This age placed her in the category of a "younger" person under social security regulations. 20 C.F.R. § 404.1563(c).[2] She graduated from high school and worked over the years as a bartender/cook and as a cleaning supervisor.

Plaintiff has struggled with ongoing foot problems since at least March 2013. She underwent foot surgery on three occasions. In March 2013, she had left-foot surgery due to a large fluid mass. (Doc. #6, *PageID* #s 350-59). In February 2015, she underwent right-foot surgery. *Id*. at 472-74. And, in January 2016 she had left-foot surgery that included Achilles tendon lengthening. *Id*. at 740-45. The ALJ found, "Although she has a history of

---

[2] Citations to social security regulations will identify the pertinent Disability Insurance Benefits regulation with full knowledge of the corresponding Supplemental Security Income regulation.

foot pain and surgical treatment for bilateral foot abnormalities, she has recovered well from these procedures ….” *Id*. at 46. Based on this level of recovery, the ALJ concluded that Plaintiff could perform a reduced range of light work beginning on, and since, her claimed disability onset date in March 2013. *Id*.

**B.**

Plaintiff testified during a hearing held by ALJ Motta that she has 2 children (ages 23 and 19), and 2 grandchildren (a 3-year old and 3-week old). All 5 of them lived together at the time of the ALJ’s hearing.

Plaintiff acknowledged that she stopped working her bartender-cook job because she was let go when the business closed. (Doc. #6, *PageID* #73).

When asked to identify her disability, Plaintiff explained to the ALJ that she cannot be on her feet for a prolonged time, and her “back plays a factor in there, too, with lifting and everything else.” *Id*. She underwent surgery on both feet, twice on her left foot. She anticipated needing 2 more surgeries on her left foot. Plaintiff was told that she needed foot surgeries to be able to walk. She emphasized, “But I will never be pain free….” *Id*. at 77. Her foot pain prevents her from walking on her tiptoes because her ankles and feet “are so sore.” *Id*. She also has degenerative arthritis in her ankles and “pretty much in all her major joints.” *Id*. at 84.

Plaintiff’s back troubles exist at L5 and L6, which she described as “deteriorating.” *Id*. at 74. She has degenerative arthritis in these areas of her spine. She noted, “They also found a rotating disc in the center of my back and they think I have a pinched nerve in my upper back because my arms have been going quite numb….” *Id*. She takes prescription-

narcotic medication for her lower-back pain.  She indicated that the pain medication helps "[t]o an extent …." *Id*. at 75.  Her back pain is a constant "low dull ache but sometimes [with] shooting pains." *Id*. at 83.  Sometimes her arms go numb: "It starts with the right and then it slowly goes down the left." *Id*.  When her arms get numb, she cannot pick up anything without dropping it.  She experienced numbness each day.  She noted that her arms were half numb during the ALJ's hearing.  She also testified that trying to do exercises she learned during physical therapy helps at times loosen up her neck. *Id*. at 83.

Plaintiff "sometimes" babysits her grandchildren. *Id*. at 76.  She watches cartoons with them and cooks quick meals for them ("like in the microwave"). *Id*.  She "sometimes" helps change the baby's diaper. *Id*.  She does not take them to the park or anyplace outside except to the backyard where her granddaughter can play on a swing set.  Plaintiff noted that walking is a limitation for her.  She estimated that she can walk about half a block.

Plaintiff sorts and folds laundry after it is clean.  Her children carry the laundry. *See id*. at 77.  She tries to plant flowers in a pot so she does not have to bend down—she has trouble getting up. *Id*. at 78.  She goes to the store for short periods of time and occasionally visits her mother.  She sees her boyfriend daily, but they only go out to eat once in a great while.

Plaintiff can dress herself but has trouble putting on her socks and tennis shoes because she can't easily bend.  She can take a shower or bath, although her shower is equipped with bars because she has fallen in the shower. *Id*. at 82.  She uses Facebook and sometimes reads a book, magazine, or newspaper.

Plaintiff testified that her foot problems have worsened since her asserted disability onset date in March 2013. *Id*. at 77. She needs to elevate her legs to reduce her pain and swelling in her feet, especially in her left foot. She elevates her legs through the day and places an ice pack on them if necessary. She also has "a compression thing I'm to wear and sometimes the boot. I have to walk in the boot. But that's to relieve…, the stress on the ankle." *Id*. at 79-80. During a normal day, she has to elevate her leg about 3 to 4 times for 20 minutes at a time or longer. She elevates her feet above the level of her heart.

Plaintiff has good and bad days. During a good day, she does not have to go anywhere and does things at her own pace. On good days, she'll fold the laundry or try to do the dishes. It takes an hour to do the dishes because she must take breaks by walking away and siting down. She told the ALJ, "It's just a slow process." *Id*. at 81. During a bad day, she needs to lie down, take an extra pain pill, elevate her legs much longer than usual, and put a heating bad on her back. When this happens, she will lie down for about 30 to 45 minutes. *Id*. at 82.

## IV.    "Disability" Defined and ALJ Motta's Decision

In reviewing the evidence connected to Plaintiff's application for benefits, ALJ Motta utilized the 5-step analysis enumerated in social security regulations. *See* 20 C.F.R. § 404.1520(a)(4); *see e.g., Earley v. Comm'r of Soc. Sec*., 893 F.3d 929, 931 (6th Cir. 2018). Some of the ALJ's more significant conclusions occurred at Steps 2 and 3 where she found that Plaintiff's severe impairments—"bilateral foot deformities with residuals of surgery; mild to moderate lumbar degenerative disc disease; moderate obesity; and asthma"—plus her non-severe impairments did not automatically qualify her for benefits under the

Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. #6, *PageID* #s 42-44).

At Step 4, the ALJ concluded that Plaintiff could perform the "less than the full range of light work," or, more specifically:

> lift up to 20 pounds occasionally and 10 pounds frequently; standing and walking limited to combined to total of four hours in an eight-hour workday; only occasional postural limitations, such as climbing stairs/ramps, balancing, stooping, kneeling, crawling, or twisting side to side, but with no crouching as part of job duties; no climbing ropes, ladders or scaffolds; no exposure to hazards, such as dangerous machinery, driving as part of job duties, or working at unprotected heights; no exposure to vibration; no concentrated exposure to extremes of heat, cold, wetness, or humidity; and no concentrated exposure to dust, odors, fumes, gases, chemicals, or poorly ventilated areas.

*Id*. at 44-45. Given these limited abilities, Plaintiff could no longer engage in her past relevant work. *Id*. at 50.

Continuing to step 5, ALJ Motta determined that Plaintiff could perform a significant number of jobs available in the national economy. Her ability to do such jobs meant she was not under a disability and not eligible to receive Disability Insurance Benefits or Supplemental Security Income. *Id*. at 51-52.

**V.     Discussion**

**A.**

Plaintiff explains that her "allegations of disability center on her severe bilateral foot pathologies." (Doc. #8, *PageID* #853). She contends that the ALJ (1) failed to reasonably account for her foot swelling and need for elevation, (2) erred by requiring objective evidence to support her asserted need to elevate her leg due to swelling, and (3) unreasonably assessed her daily activities.

Addressing Plaintiff's first contention, the Commissioner argues that the ALJ considered the evidence related to Plaintiff's impairments and adequately explained that she could perform light work with limitations that reasonably accounted for her impairments, including her foot impairments. The Commissioner also asserts that the ALJ properly considered Plaintiff's lower-extremity swelling by observing it was an appropriate symptom during her periods of recovery from surgery. And, the ALJ correctly recognized, according to the Commissioner, that Plaintiff's treating physician, Safet Hatic, M.D.'s, instructions to elevate her leg during recovery from surgery, combined with Plaintiff's subjective allegations, did not require a limitation to elevate her leg or an ultimate finding of disability. (Doc. #12, *PageID* #876).

Addressing Plaintiff's second argument, the Commissioner maintains that the ALJ did not reject Plaintiff's subjective allegations based solely on a lack of supporting objective evidence. The ALJ instead discounted Plaintiff's subjective statements based on other reasons including her inconsistent statement that she stopped working because she was laid off, not because she was under a disability, the Commissioner asserts.

The parties' contentions mainly concern the ALJ's assessment of Plaintiff's subjective descriptions of her symptoms, particularly the intensity, persistence, and limiting effects of the symptoms she has reported. In years past, this assessment would have delved into the murky realms of credibility. *E.g., Rogers*, 486 F.3d 246-49; *cf. Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004) ("The administrative law judge must ... evaluate the applicant's credibility with great care. His responsibility is all the greater because determinations of credibility are fraught with uncertainty...." (citation omitted) ).

More recently, the Social Security Administration eliminated its use of the term "credibility" and clarified "that subjective symptom evaluation is not an examination of an individual's character...."  Soc. Sec. R. 16-3p, 2016 WL 1119029, *1 (effective on March 28, 2016).[3]  Consequently, character is not destiny in social security cases.  Destiny for social security claimants is controlled by longstanding rules: "There is no question that subjective complaints of a claimant can support a claim for disability, if there is also objective medical evidence of an underlying medical condition in the record."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (citing *Young v. Sec'y of HHS,* 925 F.2d 146, 150-51 (6th Cir. 1990); *Duncan v. Sec'y of HHS,* 801 F.2d 847, 852 (6th Cir. 1986) ); *see* 20 C.F.R. § 404.1529(a).  Determining whether such objective evidence exists does not consider the actual severity of a claimant's pain or other symptoms.  Ruling 16-3p makes this point crystal clear by way of example:

> [I]f an individual has a medically determinable impairment established by a knee x-ray showing mild degenerative changes, and he or she alleges extreme pain that limits her ability to stand and walk, we will find that individual has a medically determinable impairment that could reasonably be expected to produce the symptom of pain.  We will then proceed to step two of the two-step process, even though the level of pain an individual alleges may seem out of proportion with the objective medical evidence.

Ruling 16-3p, 2017 WL 5180304, *3.

Proceeding to the second step of symptom analysis—where severity is investigated—ALJs consider "the intensity and persistence of the symptoms to determine the extent to

---

[3] The Social Security Administration explains, "Our adjudicators will apply this ruling when we make our determinations and decisions on or after March 28, 2016…."  Soc. Sec. R. 16-3p, 2017 WL 5180304, n. 27.  As a result, Ruling 16-3p applies in the present case because the ALJ issued her decision on June 15, 2016.  *See id*.

which the symptoms limit an individual's ability to perform work-related activities...." 20 C.F.R. § 404.1529(a); Ruling 16-3p, 2016 WL 1119029, at *2. Many relevant factors may apply, including for instance, "the claimant's daily activities; the location, duration, frequency, and intensity of symptoms; factors that precipitate and aggravate symptoms; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms...." *Rogers*, 486 F.3d at 247 (citations omitted); *see* Ruling 16-3p (citing factors in 20 C.F.R. § 404.1529(c)(3) ).

In the present case, the ALJ first found that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of her alleged symptoms." (Doc. #6, *PageID* #46). This is correct. The record chronicles the course of Plaintiff's foot abnormalities with a plethora of objective evidence[4] that confirms the existence of her medically determinable impairments. Chronologically, as the ALJ accurately observed, an x-ray and MRI in March 2013 revealed that Plaintiff had a large fluid mass on her left foot. This led to her foot surgery in March 2013. In January 2014, Dr. Hatic reported that she had a pes cavis in her left midfoot, abnormal positioning of the hallux, development of left-sided equinus, and an antalgic gait. In July 2014, she had a profound cavernous deformity with progressing equinus and an MRI of her right ankle showed a longitudinal split tear in her peroneous brevis tendon, leading to surgery in February 2015. In May 2015, an MRI of Plaintiff's right ankle showed markedly abnormal morphology and chronic tendonopathy of

---

[4] The Regulations broadly define "objective" evidence to include laboratory findings, x-rays, electrophysiological studies, and "signs" consisting of "anatomical, physiological, or psychological abnormalities which can be observed …." 20 C.F.R. §§ 404.1528-.1529(a).

her Achilles tendon without tears.  An October 2015 MRI of Plaintiff's left ankle and foot showed osteoarthritis with fluid collection at the surgical sight of her first toe and soft tissue of her second toe.  In January 2016, Dr. Hatic performed left equinus-varus-corrective surgery with osteotomy and lengthening of her Achilles tendon.  (Doc. #6, *PageID* #s 46-47).  Because physicians have diagnosed Plaintiff's various foot abnormalities based on examination, x-ray, and MRI, and treated these problems with surgery and prescription medication, the record contains sufficient objective evidence to show that she has an underlying medical condition that "could reasonably be expected to produce [her alleged] pain and other symptoms."  20 C.F.R § 404.1529(b)(1); *see Jones*, 336 F.3d at 475-76 ("The doctors in this case diagnosed Ms. Jones with various disorders, medicated her for those disorders, and have therefore supplied the requisite objective medical condition to support Ms. Jones's claim for disability."); Soc. Sec. R. 16-3p, 2017 WL 5180304 *3 (effective March 28, 2016) (providing the example of a person alleging extreme knee pain whose x-ray showed mild degenerative knee changes; such person has a medically determinable impairment that could reasonably expected to produce pain).  Given all this evidence, the ALJ symptom analysis got off on the right foot at step one by concluding that Plaintiff's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms.

At step two of the symptom analysis, the ALJ found that Plaintiff's description of her alleged symptoms and limiting effects "are not *entirely* consistent with the medical evidence and other evidence in the record …."  (Doc. #6, *PageID* #46) (italics added).  After

discussing much of the evidence, the ALJ similarly concluded, "the claimant's complaints of disabling symptoms are not *fully* supported by the record…." *Id.* at 49 (emphasis added).

To the extent the ALJ required all the medical evidence to confirm Plaintiff's subjective descriptions of her swelling and pain, she measured the intensity, persistence, and limiting effects of Plaintiff's symptoms using a higher standard than the Regulations mandate. Rather than requiring a individual's statements to be in line with all the medical evidence (as the ALJ says, "not *entirely* consistent with the medical evidence"; "not *fully* supported by the record," *id.* (emphasis added)) , the Regulations explain, "In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence…." 20 C.F.R. § 404.1529(a)(1). The Regulations further promise, "we will not reject your statements about the intensity or persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements." *Id.* at § 404.1529(c)(2).

Even if the ALJ did not impose an incorrect (higher) standard to evaluate Plaintiff's symptoms, the evidence the ALJ discusses and cites is not substantial and provides only *de minimis* support for her rejection of Plaintiff's alleged symptoms. Indeed, the ALJ largely relied on isolated physicians' notes to confirm her findings without adequately considering the contrary evidence. The ALJ moreover, overlooked that physicians have struggled for many years to efficaciously treat Plaintiff's foot and ankle symptoms with—at best—short-term, temporary reductions of her symptoms rather than improving her abilities to perform

and tolerate work activities such as standing, walking, and carrying weight. *See Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) ("[A] substantiality of evidence evaluation does not permit a selective reading of the record." (citation omitted)); *see also Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) ("ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position.").

The ALJ twice observed that after Plaintiff's surgeries, physicians noted "good healing of the surgical incision" and "surgical incisions healing nicely." (Doc. #6, *PageID* #46 (citing *PageID* #482)). Such notations say little, if anything, about the level of Plaintiffs' foot and ankle pain and swelling after her surgeries. Although a poorly healing surgical scar could certainly cause pain and swelling, the fact that Plaintiff's surgical scars were healing well says nothing probative about the effects of the more subterranean surgery physicians performed in her lower extremities.

Similarly, the ALJ referred to Plaintiff's "minimal erythema," *id*. at 46, and "some erythema" that was resolving, *id*. at 47. Erythema refers to "[r]edness of the skin…. [A] common but nonspecific sign of skin irritation." <u>Taber's Cyclopedic Medical Dictionary</u>, p. 704 (19th Ed. 2001). The presence of minimal or some erythema shines no light on the severity of Plaintiff's symptoms that resulted from surgeon's deeper dives into her lower extremities.

More significantly, the ALJ repeatedly relied on brief notes in Plaintiff's medical records without considering them in context and without recognizing that the notes are

13

vague and relative to the intensity and persistence of Plaintiff's ongoing anatomical foot and ankle problems.  For example, the ALJ observed that Plaintiff's first surgeon, Gregory Barbour, D.P.M., noted "only moderate—and reduced—edema [swelling] …." (Doc. #6, *PageID* #46).  This same page of the medical record indicated that Plaintiff's left foot was "still very tender to touch—hypersensitive." *Id*. at 225.  She also told Dr. Barbour she experienced pain, tingling, burning that was worse at night. *Id*.  Dr. Barbour believed that Plaintiff was experiencing this tingling and burning.  This is seen in his diagnostic assessment of neuralgia, neuritis, and radiculitis, unspecified and his decision to prescribe Gabapentin.  He also accepted Plaintiff's report about her pain, diagnosing her with "pain in limb" and prescribing Percocet, which contains oxycodone, a narcotic pain reliever. *See* http://www.mayoclinic.org (search for "oxycodone and acetaminophen").  Dr. Barbour instructed Plaintiff to continue icing and elevating her left foot and to "use shoes and activities as tolerated." *Id*.  The ALJ gave no indication that she considered this evidence of Plaintiff's significant ongoing symptoms when selecting the isolated note that described her swelling as moderate and viewing this note as evidence inconsistent with Plaintiff's alleged symptoms.

The ALJ also relied on Dr. Barbour's note in September 2013 that documented Plaintiff had mild left-foot pain when wearing shoes and with activities. *Id*. at 46 (citing *PageID* #s 223-24).  This noted alone provides only a modicum of support for the ALJ's decision to find Plaintiff's alleged symptoms not as severe as she alleged because Dr. Barbour also noted in this treatment record that Plaintiff was still experiencing "burning pain" similar to her pre-surgery burning pain.  Yet, the ALJ overlooked the conflict between

these notes and, instead, erred by selecting only the one that favored her non-disability finding over the other note that supported the severity of Plaintiff's alleged symptoms.

Even if it can be said that the ALJ drew a reasonable conclusion about the significance of Plaintiff's mild pain in September 2013, she was soon having additional serious left-foot problems documented by Dr. Hatic in early January 2014. Here, again, the ALJ took an overly selective view of the evidence by not recognizing the consistency of Dr. Hatic's medical findings with Plaintiff's subjectively described symptoms. The ALJ noted, in part, "Dr. Hatic recommended inserts and/or braces." *Id*. at 46. This is not a precise or reasonable reading of Dr. Hatic notes. Rather than recommending inserts and/or braces, Dr. Hatic explained, "I think given her foot anatomy, we may need to consider the role of some inserts and/or bracing. I am a little bit concerned with the degree of equinus that she is developing on this left side. I think that is primarily compensatory at this point, but again, that can be a real problem in the future as it can limit our ability to brace the foot and get her into supportive shoe gear." *Id*. at 410. This explanation says much more about Plaintiff's left-foot problems than the ALJ's view that "Dr. Hatic recommended inserts and/or braces." *Id*. at 46. In addition, Dr. Hatic found that (1) Plaintiff has "a dramatic amount of equinus"[5] that had worsened since her March 2013 surgery; (2) she has "very profoundly high arches and really she has an underlying acute … chronic cavernous deformity…," the same in both her feet; and, (3) she is "exquisitely tender around [her surgical] scar… and has a significant

---

[5] "Equinus" is "a condition characterized by tiptoe walking on one or both feet. It is usually associated with clubfoot." http://medical-dictionary.thefreedictionary.com (search for "equinus").

amount of hyperesthesia and dysesthesias in that area."[6]  *Id*. at 409.  Dr. Hatic also reported

that Plaintiff "has really failed to make the kind of recovery [from her March 2013 left-foot

surgery] that she had hoped.  She has had increasing amounts of pain.  She described it as a

burning, sharp, and stabbing pain that seems to be worse when she is barefoot, but it is very

difficult for her to get into any kind of shoe because of both swelling and pain…."  *Id*.  In

summary, Dr. Hatic observed, "this is a very difficult and challenging problem …."  *Id*.  The

ALJ's brief discussion of Dr. Hatic's January 2014 treatment notes, *see id*. at 46, fails to

address the consistency of his findings and his acceptance of Plaintiff's subjective

descriptions of her symptoms and their limiting effects.

Dr. Hatic later treatment notes, in September 2014, reveal that Plaintiff's right foot

was becoming "increasingly unstable."  *Id*. at 402.  He said, "She has difficulty even with

bracing…."  *Id*.  This means that Dr. Hatic's previous reference to foot bracing (in January

2014) did not lead to efficacious treatment of Plaintiff's foot abnormalities and symptoms.

As a result, Dr. Hatic's September 2014 reference to bracing—or recommendation of

bracing (as the ALJ saw it)—cannot be reasonably viewed as inconsistent with Plaintiff's

alleged symptoms.

The ALJ also took out of context Dr. Hatic's note in March 2016, indicating that

Plaintiff "overall is doing really well."   (Doc. #6, *PageID* #47 (quoting *PageID* #655)).

This general description must be read in relation to the serious nature of Plaintiff's ongoing

---

[6] "Hyperesthesia" refers to "[a]n increased sensitivity to sensory stimuli, such as pain or touch."  Taber's
Cyclopedic Medical Dictionary, p. 983.  "Dysesthesia" refers to "1. Impairment of any sense, especially of
the sense of touch.  2. a painful, persistent sensation induced by gentle touching of the skin."  http://medical-
dictionary.thefreedictionary.com (search for "dysesthysia").

recovery from her third surgery because Dr. Hatic reported, "Again, I think she has some recovery ahead of her. I would continue to progress her weightbearing program in the boot walker with physical therapy …." *Id*. at 656. Thus, at the time Plaintiff was "doing really well overall," she was not able to fully weight her left foot, needed to use a boot walker to improve her ability to put weight on her left foot, and was being treated with ongoing physical therapy. Similarly, a month later, the ALJ explained, "According to Dr. Hatic, the claimant was not progressing as he had hoped, but he said she was ultimately 'doing ok[ay].'" *Id*. at 47 (ALJ's brackets). Here again, the ALJ erred by selecting evidence to support her conclusion that Plaintiff's subjective allegations were inconsistent with the medical evidence without considering contrary evidence appearing in the same treatment notes. Dr. Hatic described Plaintiff's treatment at that time as "just trying to get her to a point where we have her pain and hypersensitivity under control so she can really make progress with therapy." *Id*. In this context, a note saying Plaintiff was "doing okay," says nothing meaningful about the intensity and persistence of her symptoms.

The ALJ also failed to consider the fluctuating and progressive nature of Plaintiff's foot abnormalities and symptoms. Instead, the ALJ she found, "Although [Plaintiff] has a history of foot pain and surgical treatment for bilateral foot abnormalities, she has overall recovered well from these procedures …." *Id*. at 46. This conflicts with evidence the ALJ overlooked such as Dr. Hatic's report in December 2014 that he was again discussing surgery with Plaintiff. He diagnosed her with pain in her "joint, ankle and foot"; synovitis and tenosynovitis; "Lesion of plantar nerve"; "Equinus deformity of foot, acquired"; and "Cavus deformity of foot, acquired." *Id*. at 495. He wrote, "Again, I do not realistically

think we are ever going to be able to have her pain free.  Our goal here is a mechanically improved foot maintaining motion; hopefully, helping her with pain and recurrent issues overall."  *Id*.  The ALJ did not take account of the ongoing—if not permanent—nature of Plaintiff's pain when assessing the persistence of her symptoms.

The ALJ's consideration of Plaintiff's daily activities is also problematic.  She found Plaintiff's daily activities "inconsistent with [Plaintiff's] complaints of symptoms and limitations" and supportive of the finding that Plaintiff could perform a limited range of light work.  *Id*. at 48-49.  Yet in reaching these conclusions, the ALJ unreasonably stretched Plaintiff's statements and testimony.  This is seen in several of the ALJ's daily-activity findings.  The ALJ found, for instance, that Plaintiff could "prepare some meals and do light household chores, albeit with rest breaks or with the help of her children."  *Id*. at 49.  Without more specific information about these what these activities entail, they say little about her work abilities particularly when a limited number of breaks are provided during an eight-hour workday and when the help of her children would not be available to her in the workplace.

Plaintiff said a little more about her babysitting activities:  she changed diapers, made "quick easy meals and watched cartoons with them."  Plaintiff explained that she uses the microwave to cook—an activity nowhere near the ALJ's finding that she could perform a limited range of light work.  Changing diapers without more specific information does not say how long she can stand, walk, or sit during an eight-hour workday, and her ability  to watch cartoons says more about how much she loves her grandchildren than it does about her work abilities.  The ALJ further noted that Plaintiff did not take her grandchildren

outside but did watch them play in the backyard where there is a swing set. Such sedentary activity is reasonably consistent—not inconsistent—with her descriptions of the intensity, persistence, and limiting effects of her symptoms

The ALJ also relied on Plaintiff's description of her occupation in December 2014 and January 2015 as "homemaker." *Id*. at 48 (citing *PageID* #s 494, 695). Although the term "homemaker" by itself might in a different case be probative of a person's work abilities, it does not reasonably do so in Plaintiff's treatment notes because the notes say nothing specific about the work Plaintiff did as a homemaker or how it impacted her symptoms.

The ALJ also pointed to Jeffrey Rogers, D.O., indication in January 2015 that Plaintiff lived with her daughter and grandchildren and was fully functional. *Id*. at 49 (citing *PageID* #438). The fact that she lived with her daughter and grandchildren says nothing meaningful about her work abilities. Dr. Rogers' indication that she was fully functional ("fully funcitonal" [sic]) is not connected to any particular activity, let alone a work activity or light-work activities. It is wholly unclear what Dr. Rodgers meant by fully functional in terms of Plaintiff's work abilities and limitations, and there is no indication that he thought she was fully functional in performing full-time work, even a reduced range of light work. And, Dr. Rogers commented, "She will likely never be pain free. The goal of upcoming surgery is to improve function and hopefully lessen the pain." *Id*. at 438. Considering Dr. Rogers' goal of improving Plaintiff's function and pain, his phrase "fully functional" is too imprecise in meaning, and it does not reasonably follow from it that Dr. Rogers believed Plaintiff was fully functional in terms of her work abilities.

The ALJ also noticed that Plaintiff saw her boyfriend every day, and they ate out once in a while. This says something about her ability to socialize but it says nothing about her ability to perform physical work activities.

Accordingly, Plaintiff's challenges to the ALJ's assessment of her symptoms and her residual functional capacity are well taken.

**B.**

Plaintiff contends that the ALJ unreasonably relied on the opinions provided by physicians who reviewed the record for the Ohio Division of Disability Determinations.

Steve E. McKee, M.D. reviewed the record in December 2014. He concluded that Plaintiff could occasionally lift and/or carry 20 pounds and frequently lift and carry 10 pounds; she could stand and/or walk about 6 hours in an 8-hour workday; and she could sit with normal breaks for about 6 hours in an 8-hour workday. Her ability to push and push was unlimited, except for her lifting and carrying restrictions. Dr. McKee explained that Plaintiff's right foot is "increasingly unstable, difficulty even with bracing." (Doc. #6, *PageID* #100). He understood that she had an antalgic gait, her pulses were present at posterior tibialis and dorsal pedal (2+), and "Ext [Extremity] has normal development and no calf atrophy.…" *Id*.

As to Plaintiff's postural limitations, Dr. McKee believed that Plaintiff could occasionally climb ramps/stairs; never climb ladders, ropes, or stairs; occasionally balance; frequently stoop by bending at her waist; frequently kneel; frequently crouch by bending at her knees; and frequently crawl. *Id*. at 100-01. He recognized that Plaintiff "does have lumbago, radiculopathy, and pain in limb…," *id*. at 102, and that an x-ray on February 6,

2013 showed degenerative disc disease and lumbar facet arthropathy, "but minimal L4-5 degenerative disease." *Id*. He further reported that Plaintiff had a "neoplasm removed from her foot and for a time used a kneeling walker. But, exam of 8/23/13 showed space incision was well healed, and [she] had only mild pain with shoes, activity, and walking [without] assistance. [She is] able to care for her granddaughter, care for personal hygiene, and tend to household chores." *Id*.

In April 2015, Diane Manos, M.D., reviewed Plaintiff's records and reached identical conclusions as Dr. McKee except Dr. Manos found that Plaintiff could stand and/or walk 4 hours in an 8-hour workday. Dr. Manos provided the same explanation as Dr. McKee. But, she also reviewed Plaintiff's February 2015 examination notes concerning her follow-up visit after her January 2015 foot surgery. Dr. Manos pointed to treatment notes saying, "cavocarus reconstruction. Is doing really well. Incision is healing nicely." *Id*. at 136. Dr. Manos thought that Plaintiff's medical records "would support sedentary RFC [residual functional capacity]." *Id*.

The ALJ placed great weight on the opinions expressed by Dr. McKee and Dr. Manos, with the greatest weight on Dr. Manos's opinion "as it is supported by objective signs and findings in the preponderance of the record, including the records submitted after their assessments." *Id*. at 50. The ALJ found that Plaintiff did well after her February 2015 right-ankle surgery "to the point she required no further treatment after July 2015…, *id*.; and, she progressed well after her left-foot surgery in January 2016. And, to account for the remaining effects of Plaintiff's January 2016 surgery, the ALJ noted that Plaintiff had

certain postural limitations—for example, occasional climbing ramps or stairs; occasional

balancing; no climbing ropes ladders, or scaffolds. *Id.*

The factors applicable to the ALJ's weighing of record-reviewing physicians (also

called "consultants")—like Drs. McKee and Manos—are denominated "supportability,"

"consistency," "specialization," and "other factors." 20 C.F.R. §§ 404.1527(c)(3)-(6). The

regulations promise that ALJs will use relevant factors "such as the consultant's medical

specialty and expertise in [the Social Security Administration's] rules, the supporting

evidence in the case record, the supporting explanations the medical or psychological

consultants provides, and any other factors relevant to the weighing of the opinions…." *Id.*

at § 404.1527(e)(2).

"Unless a treating source's opinion is given controlling weight, the [ALJ] must

explain in the decision the weight given to [record reviewers'] opinions…, the same as the

[ALJ] must do for any opinions from…," treating, nontreating, or other nonexamining

physicians who do not work for the state agency. *Id.*; *see Miller v. Comm'r of Social Sec.*,

811 F.3d 825, 836-37 (6th Cir. 2016).

In the present case, the ALJ placed "great weight" on Dr. McKee's opinions and the

"greatest weight" on Dr. Manos's opinions, "as … supported by objective signs and findings

in the preponderance of the record, including records submitted after their assessments."

(Doc. #6, *PageID* # 50). The ALJ explained that Plaintiff "did well after the February 2015

right ankle surgery, to the point she required no further treatment after July 2015. Although

she underwent another left foot surgery in January 2016, she has been progressing well.

The [ALJ] included more restrictive postural limitations to further account for the residuals

of this surgery, as well as any exacerbating effects of the claimant's moderate obesity…." *Id*.

Substantial evidence does not support the ALJ's reliance upon Drs. McKee's and Manos's opinions because significant probative evidence concerning the health of Plaintiff's lower extremity was submitted after their assessments of the record.

Dispositive weight may be placed on state-agency, record-reviewing physicians' opinions in "appropriate circumstances." *Blakley*, 581 F.3d at 409. "One such circumstance may occur, for example, when the 'State agency medical ... consultant's opinion is based on a review of a complete case record that ... provides more detailed and comprehensive information than what was available to the individual's treating source.' " *Blakley*, 581 F.3d at 409 (quoting Soc. Sec. R. 96-6p, 1996 WL 374180, at *3 (July 2, 1996)). "However, where a non-examining source has not reviewed a significant portion of the record and the ALJ fails to indicate that she has 'at least considered [that] fact before giving greater weight' to the reviewing doctor's opinion, the ALJ's decision cannot stand." *Norris v. Comm'r of Soc. Sec.,* No. 1:15cv362, 2016 WL 2636310, at *9 (S.D. Ohio 2016) (Litkovitz, M.J.) (citing *Blakley*, 581 F.3d at 409), *Report and Recommendation adopted,* 2016 WL 3228399, at *1 (S.D. Ohio, 2016) (Dlott, D.J).

Dr. McKee and Dr. Manos reviewed the record before Plaintiff's last two surgeries— one in February 2015; the other in January 2016. As a result, the record they reviewed lacked significant probative evidence about those surgeries and the medical treatment she received after their review. Dr. Manos prepared her opinions in April 2015, just two months after Plaintiff's right foot surgery and nearly a year before her second left foot

surgery. Without the additional surgical and treatment records, both Drs. Manos' and McKee's frame of reference concerning Plaintiff's long-term condition and work limitations was overly narrow. Drs. Manos and McKee appear to have reviewed no more than the record's first eight medical exhibits. *See* Doc. #6, *PageID* #s 302-499. This means neither of them had the opportunity to review or consider multiple items that described Plaintiff's lower-extremity problems and the medical-care she received over the years, including but not limited to:

- Records related to her second left foot surgery. *See* at 500-01, 740.

- Significantly abnormal results of her lumbar MRI. *Id*. at 593, 736-37.

- Her cervical imaging and all of the records related to her neck pain and upper extremity radicular symptoms. *See id.* 674-88, 735.

- Treatment notes generated by Dr. Hatic's office. *See id*. at 624-734.

- Post-surgical imaging of her right foot/ankle. *See id*. at 738-39.

The Commissioner asserts that caselaw validates an ALJ's reliance on state-agency physicians' opinions because, "by the very nature of their use, the state agency consultative opinions are generally dated some months or even years before the ALJ's decision is authored." (Doc. #12, *PageID* #882 (citing *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009)). This generality is accurate but does not assist the Commissioner in the present case due to the significance, explained above, of the medical records submitted after the assessments by Drs. McKee and Manos.

The Commissioner disagrees based on the assertion that the ALJ properly considered the evidence submitted after Drs. McKee and Manos not only when crediting their opinions

but also earlier in her decision where she discussed the treatment notes in detail, including evidence showing that Plaintiff recovered from her surgeries. These arguments hold sway if substantial evidence supports the ALJ's findings concerning Plaintiff's treatments notes and other evidence post-dating Dr. McKee's and Dr. Manos's opinions. Yet, as explained above, the ALJ's review of those treatment records was overly selective and substantial evidence did not support her findings. *Supra*, § IV(A),

The Commissioner also emphasizes that the ALJ found Plaintiff more limited than Drs. McKee and Manos by limiting her postural-work activities to account for the residuals of her surgeries in February 2015 January 2016. The Commissioner overlooks, however, that the ALJ did not modify the light-lifting restrictions that Drs. McKee and Manos believed Plaintiff had. And the ALJ failed to see that Dr. Manos believed Plaintiff could perform "sedentary" work. (Doc. #6, *PageID* #136). This meant that Dr. Manos did not understand the lifting/carrying abilities needed to do sedentary work (no more than 10 pounds) versus light work (lifting/carrying 20 pounds occasionally and 10 pounds frequently). Dr. Manos' opinion that Plaintiff could perform sedentary work conflicts with her opinion that Plaintiff could lift/carry enough weight to perform light work. *See* 20 C.F.R. 404.1563(c). This conflict does not inspire confidence in Dr. Manos' understanding of the Regulations, a factor the ALJ overlooked when reviewing her opinions.

Accordingly, Plaintiff's challenges to the ALJ's review of the medical sources' opinion are well taken.

## VI.    Remand For Further Proceedings

Remand is warranted when an ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand for an ALJ's failure to follow the regulations might arise, for example, when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff's credibility lacking, *Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted "only where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking." *Felisky*, 35 F.3d at 1041 (quoting *Faucher v. Sec'y of Health & Humans Servs.*, 17 F.3d 171, 176 (6th Cir. 1994)).

A remand for an award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and because the evidence of disability is not strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176. Yet, Plaintiff is

entitled to an Order remanding this matter to the Social Security Administration pursuant to sentence four of § 405(g) due to errors identified above. On remand the ALJ should be directed to review Plaintiff's disability claim to determine anew whether she was under a benefits-qualifying disability pursuant to the applicable five-step sequential evaluation procedure.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability finding be vacated;

2. No finding be made as to whether Plaintiff Carletta Wilson was under a "disability" within the meaning of the Social Security Act;

3. This case be remanded to the Social Security Administration under sentence 4 of 42 U.S.C. §405(g) for further consideration consistent with this Report and any Decision and Entry adopting this Report and Recommendations; and

4. The case be terminated on the docket of this Court.

April 16, 2019                                        *s/Sharon L. Ovington*
                                                      Sharon L. Ovington
                                                      United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).